UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MICHAEL HOOTEN,

Plaintiff,

v.                                                  CAUSE NO. 3:26-CV-11-JTM-AZ

DANI, et al.,

Defendants.

OPINION AND ORDER

Michael Hooten, a prisoner without a lawyer, was granted leave to proceed on a

claim that Dr. Carl Kuenzli and Nurse Practitioner ("NP") Danielle Hamlin, medical

providers at Miami Correctional Facility ("MCF"), are denying him needed medication

to manage his multiple sclerosis in violation of the Eighth Amendment. (DE # 10.) He is

also proceeding on a claim against the Warden of MCF for injunctive relief related to his

ongoing need for medical care. (*Id.*) He moves for a preliminary injunction requiring

that he be given additional pain medication and be taken to see his neurologist

immediately. (DE ## 22, 28.) The Warden filed a response (DE # 31), and the time has

expired for Hooten to file a reply. *See* N.D. Ind. L.R. 7-1(d)(2)(B).

Before turning to the merits, a procedural matter must be addressed. Hooten's

original motion for a preliminary injunction was unsigned, so the court directed the

clerk to send him the unsigned motion and ordered him to immediately sign, date, and

return it to the clerk for filing. (DE # 23.) He complied, but he also submitted a number

of additional exhibits when he returned the motion for filing. (DE # 28.) The revised

motion was received only one day prior to the date the Warden's response was due, and the Warden therefore moves to strike it as improper. (DE # 31.) It is true that the court did not grant Hooten leave to amend his motion. However, the court finds it unnecessary to strike this filing because as the Warden points out, the additional exhibits Hooten submitted have limited relevance, as they are several years old and relate to his medical care at another facility. (DE # 28-1.) The court will not strike the revised motion and will instead afford Hooten's supporting evidence the weight it deserves.

## BACKGROUND

Hooten is 45 years old and was diagnosed with multiple sclerosis ("MS") in 2016. (DE # 30-1 ¶ 8.) MS is a neurological condition that can affect a patient's ability to walk and can cause muscle pain and discomfort. (*Id.*) Prior to his detention at MCF, Hooten was at Wabash Valley Correctional Facility ("WVCF"), where he was prescribed Gabapentin, Baclofen, and Briumvi to treat his MS. (*Id.*; DE # 30-3 at 25.)

Hooten transferred to MCF in August 2025. (DE # 30-1 ¶ 2.) When an inmate arrives at MCF, medical staff typically do not adjust any medications from what they were receiving at their prior facility. (*Id.* ¶ 3.) However, if an inmate comes from a facility that distributes medication three times a day—referred to as operating three "medical lines"— the intake nurse will typically contact the doctor or nurse practitioner to have the medication adjusted, because MCF only operates two medical lines. (*Id.* ¶ 4.) That was the case here, because WVCF operates three medical lines. (*Id.* at ¶ 5.) MCF has a high security classification, and only two medical lines are run to ensure safety of

both staff and inmates by reducing movement within the facility, and also to ensure that inmates receive their medications despite frequent lockdowns. (*Id.* ¶ 6.) When no lockdown is in place, inmates come to the medical unit to obtain their medications, but if a unit is on lockdown, medications must be personally delivered by medical staff, which imposes additional staffing requirements. (*Id.* ¶ 5.)

Prior to his transfer to MCF, Hooten received a total of 3,000 milligrams of Gabapentin each day. (*Id.* ¶ 10.) Gabapentin is used to treat nerve pain related to MS. (*Id.* ¶ 11.) However, Gabapentin also influences the pleasure sensors in the brain, and so it is heavily trafficked in correctional facilities. (*Id.*) When taken with other illicit drugs, Gabapentin can increase the intoxicating effects of the illicit drug. (*Id.*) If a patient takes too large a dose of Gabapentin at one time, it can lead to dangerous side effects, including respiratory failure. (DE # 30-2 ¶ 11.)

At MCF, NP Hamlin and Dr. Kuenzli have reduced Hooten's daily Gabapentin dosage to 2,400 mg. (DE # 30-1 ¶¶ 12, 16, 21.) This reduction was made for several reasons. First, as MCF operates only two medical lines, giving him individual doses of 1,500 mg would be high enough to cause serious side effects, such as respiratory distress or failure. (*Id.* ¶¶ 11, 13.) Second, in their view Gabapentin levels over 2,400 mg are not as effective in treating MS pain symptoms, as higher doses of Gabapentin are not as effectively absorbed into the blood stream. (*Id.* ¶ 14.) Third, as the pain reduction effect of Gabapentin over 2,400 mg is negligible, any dosage over 2,400 mg is a surplus amount that could lead to drug trafficking in the facility. (*Id.* ¶ 15.)

3

Records reflect that Hooten has received Gabapentin daily since arriving at MCF. (DE # 30-4.) He missed medication distribution approximately seven times since August 2025, either because he did not come get the medication or because nursing staff did not (or could not) deliver it, but never twice on the same day. (*Id.*) Laboratory results reflect that in June 2025—when Hooten was at WVCF receiving his thrice daily dosage of Gabapentin—he had a bloodstream absorption level of 9.4 mcg/ml. (DE # 30-1 ¶ 22.) In laboratory testing conducted in March 2026, he had a bloodstream absorption level of 9.7 mcg/ml. (*Id.* ¶ 22; DE # 30-5 at 6.) In other words, his bloodstream contains more Gabapentin now than it did when he was receiving the higher dosage at WVCF. (*Id.*) In Dr. Kuenzli's medical opinion, this shows that the dosage Hooten is receiving is adequate and that a higher dosage is not medically indicated. (*Id.*)

While at WVCF, Hooten also received 75 mg of Baclofen each day. (DE # 30-1 ¶ 17.) Baclofen is used to treat muscle spasms that neurological conditions like MS can cause. (*Id.* ¶ 18.) At his medical intake at MCF on August 11, 2026, NP Hamlin ordered his Baclofen reduced to 50 mg—25 mg taken twice daily—due to MCF's twice daily medication distribution procedure. (*Id.* ¶ 19.)

On September 7, 2025, Hooten spoke to a nurse and complained about muscle spasms. (*Id.* ¶ 24.) After an evaluation, the nurse referred him to the doctor. (DE # 30-3 at 68-69.) Hooten had a visit with Dr. Kuenzli the following day. However, Dr. Kuenzli has no recollection of Hooten requesting an increase in Baclofen at this visit or mentioning muscle spasms, nor do Dr. Kuenzli's notes reflect that Hooten raised this issue. (DE # 30-1 ¶ 24; DE # 30-3 at 73-78.) Dr. Kuenzli is concerned that placing Hooten

4

on a total 75 mg of Baclofen taken in two daily doses could cause unwanted side effects. Nevertheless, now that he is aware of Hooten's concern, he intends to work with Hooten to adjust the Baclofen dosage to an amount that addresses his symptoms without producing negative side effects. (DE # 30-1 ¶ 25.)

Hooten also receives Briumvi intravenously as an infusion every six months. (*Id.* ¶¶ 26-27.) Briumvi is used to prevent MS plaques from forming on the brain and spinal cord, which helps prevent the progression of MS and MS symptoms in Hooten. (*Id.* ¶ 27.) Medical records show that Hooten had Briumvi infusions on June 6, 2025, and January 14, 2026, in accordance with the six-month schedule. (*Id.* ¶ 29.)

Medical records also reflect that during the January 14 infusion, Hooten was uncooperative. Specifically, he began tampering with the IV flush syringe when the nurse was not directly watching him. (*Id.*; DE # 30-3 at 104-105.) He then demanded a Benadryl to keep from having an allergic reaction, but his medical records do not show that he has any allergies and he did not have an adverse reaction during his June 2025 infusion. (DE # 30-1 ¶ 29; DE # 30-3 at 18, 74, 104.) The nurse advised him that she could not give him any medication without an order or medical necessity. (DE # 30-3 at 104.) Hooten then began to fiddle with the dial that controlled the rate of the infusion whenever he thought he was not being watched. (*Id.*) He also attempted to get up and walk around the medical area during the procedure. (*Id.*) Patients receiving an IV infusion should not attempt to walk. (DE # 30-1 ¶ 29.) Hooten ignored the instructions of medical staff to stay seated during the procedure. (DE # 30-3 at 105.)

5

After 45 minutes of the 60-minute procedure, Hooten turned off the infusion machine and demanded that medical staff unhook him from the machine. (*Id.*) At this point, there was an additional 450 mL of the Briumvi solution left to be administered. (*Id.*) When medical staff told Hooten this, he replied that he did not care and was done receiving the infusion. (*Id.*) Medical staff removed the IV from his arm, dressed the infusion site, and released him. (*Id.*) Dr. Kuenzli's medical opinion is that Hooten's failure to comply with the Briumvi infusion was detrimental to his MS treatment, potentially causing his MS to progress and his symptoms to worsen over time. (DE # 30-1 ¶ 30.)

Hooten is under the regular care of a neurologist, Dr. Michael Hans. Before seeing the neurologist he must have an MRI scan. (DE # 30-1 ¶ 32.) He received an MRI on July 3, 2025, and he saw his neurologist on July 9, 2025. (DE # 30-1 ¶ 34; DE # 30-7; DE # 30-8.) Dr. Hans ordered Hooten to have a second MRI with contrast, which was done on July 28, 2025. (DE # 30-7 at 8-15.) Dr. Hans has not requested to see Hooten more frequently than once a year. (DE # 30-1 ¶ 34; DE # 30-8.) In March 2026, Dr. Kuenzli submitted paperwork so that Hooten can receive another MRI in preparation for his one-year follow-up appointment with Dr. Hans in July 2026. (DE # 30-1 ¶ 35; DE # 30-3 at 111-113.)

ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A

6

plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of [his] case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no

7

further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

Because Hooten's claim relates to the denial of medical care, it is governed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove a violation of this right, a prisoner must show (1) he had an objectively serious medical need, and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize it as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). On the second prong, the inmate must demonstrate "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. The court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). In plain terms, the Eighth Amendment protects prisoners from "grossly

inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).

The record reflects that Hooten has a serious medical condition. Far from showing grossly inadequate care, the records reflect that his providers have provided him careful medical attention, complied with the orders of his neurologist, and prescribed him a number of medications to manage his condition. *See Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (in assessing deliberate indifference court must "look at the totality of an inmate's medical care"). Their professional opinion about which treatments are medically indicated, and which are not, is entitled to deference in this proceeding. *Walker*, 940 F.3d at 965.

His providers have articulated reasonable justifications for reducing his Gabapentin, including the potential for trafficking, the danger posed by giving him a high dosage twice a day, and the fact that a high dosage is more difficult for the body to absorb. Hooten's laboratory results reflect that he has more Gabapentin in his blood stream than he did on the higher dosage. Dr. Kuenzli attests he was not aware of Hooten's concerns about the Baclofen until this lawsuit, but the doctor intends to work with Hooten to increase the dosage while still staying within a medically indicated limit to avoid unwanted side effects. Hooten is not qualified to opine about his own medical needs or the appropriate dose of a medication, and his mere disagreement with providers about the proper course of treatment does not establish an Eighth Amendment violation. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). Nor does

the fact that doctors at a prior facility provided him with different treatment options. *Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014).

Records further reflect that Hooten was less than cooperative during his last Briumvi infusion, which could cause his MS to worsen. The Eighth Amendment does not entitle him to "engineer an Eighth Amendment violation" by failing to follow the instructions of his medical providers and then suing them if his health suffers. *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005). In view of the present record, Hooten has not demonstrated a likelihood of success in proving that his providers are acting with deliberate indifference to his serious medical needs. He also has not shown that he will be irreparably injured if he is not granted emergency relief while this case is pending. He has not demonstrated an entitlement to the extraordinary remedy of a preliminary injunction.

For these reasons, the court:

(1) **DENIES** the Warden's motion to strike (DE # 31); and

(2) **DENIES** Hooten's motions for preliminary injunctive relief (DE ## 22, 28).

**SO ORDERED.**

Date: May 4, 2026

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT

10